Tom J. Ferber (tferber@pryorcashman.com)
Stephanie R. Kline (skline@pryorcashman.com)
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TERRI V. DONALD,

                                   Plaintiff,                                   13 Civ. 1655 (WHP)

                    v.

THE TYLER PERRY COMPANY, INC.
d/b/a TYLER PERRY STUDIOS and LIONS GATE
ENTERTAINMENT CORP. d/b/a LIONS GATE,

                                   Defendants.

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

FACTS .................................................................................................................................1

    *Bad Apples Can Be Good Fruit* ....................................................................................2

    *Good Deeds*.....................................................................................................................5

ARGUMENT .....................................................................................................................10

   I. PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE DISMISSED ...........................10

    A.  Non-Infringement Can Be Determined As A Matter of Law .......................10

    B.  There Is No Actionable Similarity Between The Works .............................12

       1.  The Settings Are Different......................................................................12

       2.  The Characters Are Different...................................................................13

         *a.  The Protagonists and Their Romantic Interests* ...............................13

         *b.  The Other Women* .........................................................................15

         *c.  Other Key Characters Have No Counterparts*...............................16

       3.  The Plots, Sequence, Pace and "Total Concept
          and Theme" of The Book and Film Are Different...................................17

    C.  Plaintiff's Copyright Infringement Claim Fails As A Matter of Law ........18

   II. PLAINTIFF'S REMAINING CLAIMS SHOULD BE DISMISSED ...............................22

CONCLUSION...................................................................................................................23

# TABLE OF AUTHORITIES

## CASES                                                                                         PAGE(s)

Alvarado v. Kerrigan,
    152 F. Supp. 2d 350 (S.D.N.Y. 2001)..............................................................11

Arden v. Columbia Pictures Industries,
    908 F. Supp. 1248 (S.D.N.Y. 1995)........................................................*passim*

Berkic v. Crichton,
    761 F.2d 1289 (9th Cir. 1985) ................................................................20, 21

Brown v. Perdue,
    No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995 (S.D.N.Y. Aug. 4, 2005),
    aff'd, 177 Fed. Appx. 121 (2d Cir. 2006) ................................................12, 18

Carell v. Shubert Organization, Inc.,
    104 F. Supp. 2d 236 (S.D.N.Y. 2000)...........................................................22

CBS Broad., Inc. v. ABC,
    02Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 13, 2003)................21

Denker v. Uhry,
    820 F. Supp. 722 (S.D.N.Y. 1992), aff'd w/o op., 996 F.2d 301 (2d Cir. 1993)..............10

Faconti v. Henderson,
    No. 01-CV-2600 (DLI) (RML), 2006 U.S. Dist. LEXIS 61238
    (E.D.N.Y. Aug. 29, 2006) .......................................................................11

Feist Publications, Inc. v. Rural Tel. Serv. Co.,
    499 U.S. 340 (1991)...............................................................................11

Gary Friedrich Enterprises v. Marvel Enterprises, Inc.,
    713 F. Supp. 2d 215 (S.D.N.Y. 2010)...........................................................22

Green v. Lindsey,
    885 F. Supp. 469 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993)........................21

Hallford v. Fox Entm't Group, Inc.,
    No. 12 Civ. 1806 (WHP), 2013 U.S. Dist. LEXIS 19625 (S.D.N.Y. Feb. 13,
    2013) ..................................................................................10, 12, 22

Hobbs v. John,
    No. 12 C 3117, 2012 U.S. Dist. LEXIS 154452 (N.D. Ill. Oct. 29, 2012)..................12, 22

**CASES**                                                                    **PAGE(s)**

Hoehling v. Universal City Studios, Inc.,
    618 F.2d 972 (2d Cir. 1980).................................................................11, 12

Hogan v. DC Comics,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999)......................................... passim

Lewinson v. Henry Holt & Co.,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)................................................19

Muller v. Twentieth Century Fox Film Corp.,
    794 F. Supp. 2d 429 (S.D.N.Y. 2011), aff'd by, Muller v. Anderson, 501 Fed.
    Appx. 81 (2d Cir. 2012).....................................................................19

Peter F. Gaito Architecture, Inc. v. Simone Development Corp.,
    602 F.3d 57 (2d Cir. 2010).................................................................11

Reyher v. Children's Television Workshop,
    533 F.2d 87 (2d Cir. 1976).................................................................11

Rucker v. Harlequin Enterprises Ltd.,
    No. H-12-1135, 2013 U.S. Dist. LEXIS 26299 (S.D. Tex. Feb. 26, 2013) ......................21

Sheldon Abend Revocable Trust v. Spielberg,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010)...............................................17

Smith v. Weinstein,
    578 F. Supp. 1297 (S.D.N.Y.), aff'd w/o op., 738 F.2d 419 (2d Cir. 1984)...................17

Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,
    338 F.3d 127 (2d Cir. 2003)...............................................................12

Warner Brothers, Inc. v. American Broadcast Cos.,
    654 F.2d 204 (2d Cir. 1981)...............................................................10

Warner Brothers, Inc. v. American Broadcast Cos.,
    720 F.2d 231 (2d Cir. 1983)..........................................................10, 16

Zambito v. Paramount Pictures Corp.,
    613 F. Supp. 1107 (E.D.N.Y.), aff'd w/o op., 788 F.2d 2 (2d Cir. 1985)....................10

**<u>STATUTES</u>**                                                                          **<u>PAGE(s)</u>**

Fed. R. Civ. P. Rule 12(b)(6) ................................................................11

Fed. R. Civ. P. Rule 12(c) ....................................................................11

17 U.S.C. § 301(a) ...............................................................................22

17 U.S.C. §§502, 504(b) .......................................................................22

Defendants Tyler Perry Studios LLC and Lions Gate Entertainment Inc. ("Defendants") respectfully submit this memorandum of law in support of their motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

This case does not present the often-seen variety of copyright infringement claim which fails as a matter of law because the numerous similarities between the parties' works concern only noncopyrightable elements. This Plaintiff's copyright infringement claim must be dismissed because it is frivolous in the extreme; because the parties' works bear <u>no</u> similarities which could form the basis for any reasonable person to assert in good faith that the Defendants' film infringes protectable elements of the Plaintiff's book. Indeed, the characters, plotline, setting and story elements of Defendants' film are so palpably *dissimilar* to the corresponding aspects of Plaintiff's book that one is left scratching one's head trying to understand how such a singularly meritless case – in which Plaintiff alleges that Defendants "adapted" her book into a film without her consent – could have been filed in federal court, given that the two works tell completely different stories. Plaintiff's claim is not only utterly bereft of merit, it is sanctionable.

## FACTS

Plaintiff Terri V. Donald ("Donald" or "Plaintiff") is the author of a book entitled "Bad Apples Can Be Good Fruit" (the "Book") (Complaint, ¶8).[1] The Complaint alleges that the Book "contains 'protectable elements' afforded copyright protection, which protectable elements are inclusive but not limited to the unique story line, the characters portrayed in the book, the unique, mesmerizing series of events which occur in the book, the unique expressions set forth in the

---

[1] The cover of the book lists the author's name as "TLO Red'ness." <u>See</u> Exhibit B to Answer. The Book's title page and its copyright registration indicate that "Red'ness" is Donald's pseudonym, and the Book's copyright page identifies Donald as the copyright proprietor. (<u>Id.</u>)

book, and all unique content of the book." (Id. at ¶10.) Donald alleges that she sent a copy of the Book to Tyler Perry Studios and that Defendants thereafter "adapted" the Book into the Tyler Perry film entitled "Good Deeds" (the "Film") without her consent. (Id. at ¶¶13, 15, 17, 20.). Plaintiff alleges that the Film "is so substantially similar to [the Book] as to constitute actionable unlawful copyright infringement" (id. at ¶18), but the Complaint does not identify a single element of the Film which supposedly copies the allegedly "unique story line, [characters or] unique, mesmerizing series of events which occur in the [B]ook."

The Complaint contains two claims in addition to the claim for copyright infringement. The second claim, which seeks an accounting and constructive trust, alleges only that Plaintiff is entitled to such remedies "as a result of defendants' infringement." (Id. at ¶¶25-26.) The third claim, which seeks injunctive relief, states only that Plaintiff is entitled to such relief because "Plaintiff's copyrighted work is unique and extraordinary" and that Defendants' alleged infringement is causing irreparable damage. (Id. at ¶28.)

The plots of the Book and the Film, which are Exhibits B and C to the Answer, respectively, are summarized below:

### *Bad Apples Can Be Good Fruit*

The Book's story is told in the first person by its central character, Cheryl, an African-American woman who is a financially comfortable professional (Book at 3-5). Cheryl immediately describes herself as "paranoid" and is hung up about her light complexion, which she calls the "bane of [her] existence," both of which are recurring themes (id. at 2, 4-6, 41, 48-49, 51, 52, 58). Cheryl is off to meet her boyfriend Cory, a wealthy owner of a television production studio (id. at 76), at a hotel in North Carolina, where he intends to propose to her. Cheryl is dreading having an important conversation with Cory, and she hopes that he will still

want to marry her after she "airs out" her "dirty laundry" (id. at 2).  At the hotel, a fight erupts almost immediately, when Cheryl thinks Cory was having sex with a masseuse at the hotel's spa (id. at 10-15).  After make-up sex, the two head off on Cory's boat, but Cory abandons his planned proposal because of Cheryl's continuing suspicious rant about the masseuse.  The boat then hits a rock, leaving both of them injured – Cheryl with a broken leg, Cory with a concussion – and stranded as a hurricane is approaching (id. at 15-22, 58-60).  As they wait for help, Cheryl begins telling Cory the story of her past (id. at 22-32).

Cory and Cheryl are picked up by a cruise ship, which then serves as the setting for the remainder of the story (id. at 41-42, 46-47).  Most of the Book is occupied by Cheryl telling Cory her life story, repeatedly warning Cory – who is often impatient with Cheryl's painfully detailed narrative (id. at 44, 102, 168) – that he might not want to marry her after he hears everything.  Cory repeatedly responds with declarations of his steadfast love for Cheryl.  Cheryl gradually reveals the "tragic events" of a horribly painful past (id. at 44), much of which is intended to explain why she is "paranoid," distrustful of men, and hung up about her light-skinned appearance, which had been the cause of her being resented and tormented by both blacks and whites when she was younger.

Cheryl explains that she was raised by a single mother, was mistreated as a young child by an abusive stepfather (id. at 33-39), witnessed domestic violence and saw many neighborhood children face hunger, abuse, sexual molestation and murder (id. at 67-74, 87-94, 103-109, 113-118).  She also tells a horrifying story of how, at age 12,  she was kidnapped by three men and repeatedly raped (id. at 131-33).  She escaped, but thereafter she took a "deep dive for the worse," during which she moved through a succession of schools, was treated for several venereal

diseases, and was sent to a home for troubled children, where she faced further abuse and racial prejudice (id. at 133-36, 148-58, 163-68).

Cheryl later ended up on the streets, begging, where she was seemingly befriended by some prostitutes, but was then virtually enslaved by their pimp, who beat her horribly when she wouldn't yield to him (id. at 168-79). Cheryl later turned her life around, getting a job as a sales girl, taking computer training, going to college and eventually working in finance (id. at 184-86). She married an apparently wonderful man, who later turned out to be an abusive monster (id. at 186-88).

Cheryl's storytelling is regularly interrupted by (i) explicit descriptions of sex (see, e.g., id. at 56-57, 144), (ii) descriptions of the efforts of Cory's twin sister Alicia, a WNBA star, to track down her (apparently) missing brother and Cheryl (id. at 62-65, 74-80, 95-98), and (iii) the sudden appearance of Cory's bitter ex-girlfriend, Salina, who cannot let him go and schemes to break Cory and Cheryl up (id. at 119-128, 137-145, 158-62, 180-83, 192-93). Salina tries to convince Cory's sister Alicia – and then Cory himself – that Cheryl had set up the boat accident by cutting the fuel and steering lines, and that Cheryl had previously murdered her husband (id. at 180-83).

Just as Cheryl is about to finish her story, Salina succeeds in having her arrested by the ship's police (id. at 188-89). Cheryl tells Cory that her abusive husband died when he fell backward on his own knife as he was choking her (id. at 190). As Cheryl is taken into custody, Salina tells her that Cory is sexually violent (id. at 190-91). As the ship docks, Cory reveals that he has learned that it was Salina who had sabotaged his boat, trying to set Cheryl up. He proposes to Cheryl, who happily accepts, and he tells her that it was Salina, not he, who had been

sexually abusive. Cory explains that after he broke up with Salina, he spent six months in therapy being treated for spousal abuse "so that [he] could be right for [Cheryl]" (id. at 194-96).

### *Good Deeds*

The Film takes place in San Francisco. Its central character is Wesley Deeds III, a successful African-American businessman who is a fifth generation Ivy Leaguer and runs his late father's computer software company. Wesley does everything that he was raised to do. He is wealthy, has a beautiful apartment, is the CEO of his company and has an "amazing" fiancée, Natalie, who is a successful real estate agent. But Wesley is not really happy. As he says in a somber voice-over at the Film's beginning: "With a life like mine, you'd think that I wake up happy every day … but I don't. My life is perfect, but I often wonder: Am I living my own life? Or the life that I've been told to live?" Everything about Wesley's life is routine and predictable.

Wesley has an irresponsible brother, Walter, who feels that the family looks down on him and who has anger management issues. Walt's driver's license has been suspended because of numerous DUIs, so he is dependent on others to drive him. As Wesley picks up Walt on his way to work, he finds Walt having a heated argument with a woman.

The action then shifts to the central female character, Lindsey Wakefield. Lindsey has an adorable little girl, Ariel, and lots of money troubles. The superintendent of Lindsey's apartment building tells her that the building's owner is seeking to have her evicted for non-payment of rent. After promising him that she will pay the rent that day, Lindsey stops by the building where she works to pick up her paycheck. She leaves her van – with Ariel in it – in Wesley's garage space, which leads to a nasty confrontation between her and Walter. Lindsey has a lot of pride and a lot of attitude, and she calls Wesley an "ass," even though he is being mild-mannered as Walter makes trouble for her and tries to have Lindsey's van towed away. We learn that Lindsey is a

janitor in the Deeds Corporation's building and that most of her wages have been garnisheed by the IRS. Trying to make ends meet, Lindsey agrees to take on an extra shift – from 4 to 11 p.m. – even though she has no one to look after Ariel. When Lindsey and Ariel return to their apartment building that afternoon, they find all of their belongings and furniture out on the street, and the cash that Lindsey had stashed in her mattress has been taken.

Meanwhile, Natalie is shopping with her friend Heidi (the wife of Wesley's trusted colleague, John), her mother and Wesley's mother – the regal Wilimena Deeds. The two mothers are excited about the upcoming nuptials and are talking about grandchildren, the prospect of which doesn't excite Natalie.

Wesley and Walter meet their mother for lunch. Walter and Wilimena antagonize each other. While Wilimena tells Wesley that she is proud of him, she disdainfully tells Walter that he married a "trailer park cheerleader." She asks about a newspaper article which indicated that the Deeds Corporation has been jeopardized by something Walter did. Wesley tries, unsuccessfully, to keep the peace.

At the office later, Walter interrupts Wesley while he is conferring with his colleague John. Walt expresses his resentment at being dependent on Wesley for a ride home and, more importantly, his resentment that Wesley, and not he, is the CEO. After Walter leaves, John tells Wesley that Walter is not doing a good job and that he is sleeping with several employees.

Later, while Natalie and Heidi are enjoying a girl's night out, Natalie talks about how predictable Wesley's routines are.

Back at the office, Wesley is "burning the midnight oil" and has figured out how and why his competitor, Brunson, has taken away one of the company's big clients. Wesley then runs into Lindsey, who is working the night janitor shift that she has taken on. Lindsey, not realizing

that Wesley is the boss, continues to exhibit an attitude and abrasive manner and makes a crack about Wesley serving "Massa" – the "old white dude" whom she presumes owns the company. Wesley reminds her that she called him an "ass" in the garage that morning, and tells her that her daughter was afraid when Lindsey left her in the van. Lindsey resents being lectured to.

Later that night, as he's driving out of the building, Wesley sees Lindsey and Ariel in their van, parked on the street. Concerned for their safety, he wants to help, and he perseveres despite Lindsey's rudeness. When he tells her that he is the "old white man" who owns the company, she apologizes for her rudeness. When he realizes that Ariel is hungry, he takes them for pizza, where Wesley and Lindsey have a real conversation. They discover their mutual love for motorcycles. Wesley tells of his one-time dream of riding a cycle with his friends, helping people in third world countries "dig wells." Lindsey recognizes that he has a "good heart." She tells him that she had been a nursing student, but had to quit when her husband died in Iraq, forcing her to work as a janitor.

Back home, Natalie returns drunk from her night of partying. She tries to seduce Wesley in the living room, but he is too concerned about being seen though the uncovered window, and Natalie is upset by his inability to be "spontaneous." The next day, Natalie tells Wesley that he is "predictable."

Wesley, John and Walter meet with their competitors, Mr. and Mrs. Brunson, hoping to buy their company. Walter, out of control again, ruins the meeting.

Without a home, Lindsey and Ariel are forced to wash up the next morning in a filthy gas station rest room. Because of Ariel, Lindsey reluctantly tries a homeless shelter, but is attacked while they are sleeping and runs out. Ariel's teacher has discovered that they are homeless and that Ariel is often hungry. Lindsey is forced to take Ariel to work with her at night, and lets

Ariel sleep in a supply closet while she cleans.  Wesley, who is working late, finds Ariel and confronts Lindsey because he is concerned about Ariel's welfare.  Lindsey rebuffs him, telling him that he doesn't live in the real world.

John tells Wesley that Walter sabotaged the meeting with the Brunsons because Walter wants Wesley to fail so that he can run the company.

Wesley opens a child care center in his office building in order to help Lindsey.  Child welfare personnel later take Ariel from Lindsey because they are homeless.  Wesley witnesses the heartbreaking scene.  Wesley lets Lindsey and Ariel live in a luxury company-owned apartment so that Lindsey can get Ariel back.  Lindsey doesn't understand Wesley, but she thanks him.

That night, Wesley shows Natalie some spontaneity by the living room window.  The next morning, Natalie is perplexed to find that Wesley's daily routine is no longer predictable. He is dressing casually and dancing to music.

Lindsey, aware that Wesley is always doing for others, tries to get him to have some fun. She has borrowed a motorcycle and they enjoy a ride across the Golden Gate Bridge.  Feelings are clearly beginning to develop.  After Wesley spontaneously kisses Lindsey, he tells her that he is engaged.  Lindsey is hurt, disappointed and stunned.

There is subsequently an office party to celebrate the Deeds Corporation's successful acquisition of the Brunsons' company.  Unaware of the festivities, Lindsey shows up but turns to leave as soon as she sees the celebration.  Walter – drunk, and resentful as usual – instigates trouble, forcing Lindsey into a mix with Natalie and Wilimena Deeds.  An argument erupts between Walter and Wilimena, followed by a fight between the brothers in the elevator, which Natalie, Lindsey and Wilimena witness.  Natalie and Wilimena see that there is something

between Wesley and Lindsey.  Walter taunts Wesley for being "stuck in a career [he doesn't] want."

Wesley realizes that he can no longer live his programmed life.  He visits Lindsey in the company apartment.  Despite her affection for Wesley, Lindsey pushes him away.  She tells him that he needs to figure out what will make him happy.

Back at home, Natalie asks Wesley if he has slept with Lindsey.  He says that he has not, but Wesley and Natalie agree that even though they love each other, they should not get married. Natalie tells him that, despite his hopes that she would change her mind, she has never wanted to have children, as he does.  At an engagement party later, Wesley and Natalie announce that the wedding is off.  Wesley tells his mother that he needs to live his life for himself, not for her or for his father's dream, and that he is going to "travel the world."  Wesley announces that John is going to run the company.  Walter is furious, but Wesley tells him that he has only himself to blame.

Wesley goes to the office that night, where he finds Lindsey mopping the floors.  He tells her that he's not getting married and that he's going to Africa, with his motorcycle, and is going to "dig wells" with his friends who are already there.  He has bought two extra plane tickets – for Lindsey and Ariel – but Lindsey says she can't go.  He leaves the tickets, just in case.

At the San Francisco airport the next morning, Wilimena is there to wish Wesley well, but he was clearly hoping to see Lindsey.  As Wesley boards the plane, Lindsey and Ariel are already on board, waiting for him.

## ARGUMENT

## I.   PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE DISMISSED

### A.   Non–Infringement Can Be Determined As A Matter of Law

A plaintiff asserting a claim of copyright infringement must prove: (i) a valid, registered copyright; (ii) access by the defendant to the plaintiff's work; and (iii) that the defendant's work bears substantial similarity to protectable elements of the plaintiff's work. See generally Warner Bros., Inc. v. American Broad. Cos., 654 F.2d 204, 207-08 (2d Cir. 1981). For the purposes only of Defendants' motion for judgment on the pleadings, the first and second of these elements – which concern purely factual allegations – may be assumed.[2] The third and most critical element – substantial similarity of protectable elements – is here so palpably absent, however, that it is difficult to fathom how Plaintiff could have asserted it.

In the Second Circuit, non-infringement may be determined as a matter of law, "either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Warner Bros., Inc. v. American Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983) (citation omitted); see also Hallford v. Fox Entm't Group, Inc., No. 12 Civ. 1806 (WHP), 2013 U.S. Dist. LEXIS 19625, at *8 (S.D.N.Y. Feb. 13, 2013) (Pauley, J.); Hogan v. DC Comics, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999); Arden v. Columbia Pictures Indus., 908 F. Supp. 1248, 1259 (S.D.N.Y. 1995); Denker v. Uhry, 820 F. Supp. 722, 728-29 (S.D.N.Y. 1992), aff'd w/o op., 996 F.2d 301 (2d Cir. 1993); Zambito v. Paramount Pictures Corp., 613 F. Supp.

---

[2] There was, in fact, no access to, or copying of, the Book by the Film's creators, but as discussed more fully herein, even if Plaintiff were able to prove access to her Book, the Film and Book are so dissimilar that Defendants would be entitled to judgment as a matter of law because there would still be no cognizable claim of copyright infringement.

1107, 1110 (E.D.N.Y.), aff'd w/o op., 788 F.2d 2 (2d Cir. 1985); Reyher v. Children's Television

Workshop, 533 F.2d 87, 91 (2d Cir. 1976).

    While the Second Circuit's policy of reviewing the element of actionable similarity in

order "to put a swift end to meritless litigation…" and thereby avoid wasting judicial and party

resources was originally expressed in connection with summary judgment motions (see, e.g.,

Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) (citation & quotations

omitted)), the Court of Appeals has expressly approved of a district court addressing non-

infringement on a motion under Rule 12.  See Peter F. Gaito Architecture, Inc. v. Simone Dev.

Corp., 602 F.3d 57, 64-65 (2d Cir. 2010) ("Gaito").[3]

    The Gaito court emphasized that, in addressing the issue of non-infringement, "the

similarity between two works must concern the expression of ideas, not the ideas themselves"

because the "idea/expression dichotomy" essential to copyright law, which "'assures authors the

right to their original expression … encourages others to build freely upon the ideas…conveyed

by a work.'" 602 F.3d at 67 (emphasis supplied), quoting Feist Publ'ns, Inc. v. Rural Tel. Serv.

Co., 499 U.S. 340, 349-50 (1991) (emphases supplied) (other citations omitted).  The Gaito

Court then noted that this policy makes it important to determine "whether any alleged

'similarities are due to protected aesthetic expressions original to the allegedly infringed work, or

whether the similarity is to something in the original that is free for the taking.'"  Id., quoting

---

[3] Gaito concerned a Rule 12(b)(6) motion, rather than a 12(c) motion, but the standards are the
same.  See Alvarado v. Kerrigan, 152 F. Supp. 2d 350, 354 (S.D.N.Y. 2001) ("A motion for
judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is analyzed under the same standard
applicable to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)");
Faconti v. Henderson, No. 01-CV-2600 (DLI) (RML), 2006 U.S. Dist. LEXIS 61238, *12
(E.D.N.Y.  Aug. 29, 2006) ("The standard to be applied to a motion for judgment on the
pleadings brought under Fed. R. Civ. P. 12(c) is the same as a motion to dismiss under Rule
12(b)(6), when the court considers materials within the four corners of the pleadings").

Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134-35 (2d Cir. 2003) (emphasis supplied).

Consistent with this approach, a court considers whether the characters, plot, sequence, pace, setting and "total concept and theme" of the two works would be regarded by the "ordinary observer" as having the same "aesthetic appeal," but when works have both protectable and unprotectable elements, the court applies a "more discerning" test and asks whether only the protectable elements are substantially similar. Hallford, 2013 U.S. Dist. LEXIS 19625, at *10-11; accord Hogan, 48 F. Supp. 2d at 309; Brown v. Perdue, No. 04 Civ. 7417 (GBD), 2005 U.S. Dist. LEXIS 15995, at *31-32 (S.D.N.Y. Aug. 4, 2005), aff'd, 177 Fed. Appx. 121 (2d Cir. 2006).

In the present case, there was *nothing* taken from Plaintiff's Book, nor does the Film bear substantial similarity with respect to *any* of the Book's elements, let alone protectable ones. Defendants respectfully submit that it would be hard to find a more "meritless litigation" deserving of meeting a "swift end." Hoehling, 618 F.2d at 977.

### B.      There Is No Actionable Similarity Between The Works

#### 1.      The Settings Are Different

The setting of the Book is almost entirely at sea.  After the accident on Cory's boat early on, the story unfolds on a cruise ship.

The Film, by contrast, is set in various locations in San Francisco: *e.g.,* Wesley's apartment; the Deeds Corporation office building; restaurants; public spaces; the Deeds corporate apartment; and the airport.

The settings of the two works are entirely different.

### 2.   **The Characters Are Different**

None of the characters in the Film bear an actionable similarity to any of the Book's characters.

#### a.   *The Protagonists and Their Romantic Interests*

Cheryl is the protagonist in the Book, which is a first-person narrative told from Cheryl's perspective. Cheryl describes herself as a financially comfortable professional. She works in finance, and is able to dress and treat herself well. The Book repeatedly refers to Cheryl as "paranoid," being hung up about being a light-skinned African-American, and having "self-esteem" issues (Book at 3-6, 39-41, 46-50, 148-58). The focus of the Book is Cheryl's disclosure to Cory, her would-be fiancé, of her horrible past, from her abusive stepfather, to her being kidnapped and raped, to her killing an abusive husband in self-defense. She describes this unburdening both as a form of "therapy" and as a way of making sure that Cory wants to marry her even with full knowledge of all of her "dirty laundry." Cheryl's lover, Cory, inherited substantial wealth from his great grandfather, "a famous black movie writer," and invested his money in a television production studio (id. at 74-76). From the beginning of the Book's story, it is known that Cory intends to propose to Cheryl, the two having apparently been in a serious relationship for approximately six months. Cory repeatedly attempts (i) to get Cheryl to move on with her story (reflecting the sense, which the reader shares, that it often seems to be pointless and/or endless) and (ii) to assuage Cheryl's concern that he will lose interest in marrying her once he knows the details of her past. The Book's title – "Bad Apples Can Be Good Fruit" – is a metaphor drawn from Cheryl's story.

The protagonist of the Film is Wesley Deeds, who might appear to have a perfect life but is actually unhappy because he has been living up to familial expectations rather than living for himself. He is the CEO of the computer software company which his father founded and he is engaged to Natalie, a successful real estate broker. The Film's title – "Good Deeds" – is a double entendre which both identifies the central character of the story and reflects how he lives his life (and wins Lindsey's affection). Lindsey, a stranger to Wesley at the beginning of the Film, is a widowed, struggling single mother who had to give up nursing school and take a janitorial job after her husband was killed in Iraq. Lindsey is not only the vehicle for the Film to depict Wesley's compassion and fundamental goodness, but she also leads him to be spontaneous and to live life for himself.

The protagonists in the two works bear no legally cognizable similarity either to each other or to the other's romantic interest. While all of these characters are African-American and have romantic involvements, there is not the faintest similarity in copyrightable expression. In the Book, Cheryl is a successful professional with a trauma-filled past. She is in an established relationship with Cory at the start of the Book. That relationship survives physical peril – *i.e.,* the shipwreck, and the twisted manipulations of Cory's ex-girlfriend. In stark contrast, in the Film Lindsey had a happy life in the past but is presently facing great financial difficulties. Unlike Cheryl, Lindsey is not scarred by childhood traumas, and she has no hang-ups about her appearance. Also unlike Cheryl, Lindsey has no romantic interest at the start of the Film. At the beginning of the Film she is rude and hostile to Wesley, but she gradually learns to accept his platonic and altruistic acts of kindness. The Film shows the gradual growth of Lindsey's and Wesley's relationship from one that is almost adversarial to friendship and then into the

beginning of a romance.  They face neither physical peril nor the evil manipulations of an ex-lover, as Cheryl and Cory do.

While Wesley and Cory are both affluent African-American men, there is no similarity in the copyrightable expression of these two characters.  Wesley is the Film's protagonist, but Cheryl, not Cory, is the Book's protagonist.  Moreover, Wesley's signature dilemma at the Film's beginning is that he is secretly unhappy with a life that others might dream of, but Cory has no such conflict.  In the Book, Cory has long since left Salina behind and is preparing to propose to Cheryl.  In the Film, Wesley's position is entirely different: at its beginning, he is engaged to Natalie, for whom he has a deep affection and he has not yet met Lindsey.

There is thus no similarity between the central female characters or between the central male characters in the Book and Film.  Moreover, to the extent that Plaintiff's misguided claim might be asserting that there is a similarity between the works' respective protagonists – Cheryl and Wesley – it would, of course, be absurd, given their opposite sexes, background, and general disposition.

### b.      *The Other Women*

Nor is there similarity between Salina in the Book and Natalie in the Film.  Salina is a successful attorney whom Cory describes as "a money-grubbing … bitch" (id. at 159).  Despite having been in a 10 year relationship with Salina, Cory is thrown by her "deep, angry voice" and "wonder[s] if his ex, whom he had dated for so long, was a transsexual" (id. at 119-20).  Salina is also evil, unscrupulous and manipulative, and will stop at nothing to break up Cory and Cheryl in the hopes of getting Cory back – including even sabotaging Cory's boat and possibly killing them both in her effort to "set Cheryl up" (id. at 192-93).  Salina addresses Cheryl with contempt and hostility (158-64), and falsely tells her that Cory is sexually abusive (id. at 188-92), even

though it was Salina who had actually so abused Cory that he required therapy "so that [he] could be right for" Cheryl (id. at 196).

Natalie is nothing like Salina. She is a decent and caring person who genuinely loves Wesley. Standing in stark contrast to Salina's reckless and even criminal manipulations, by which she hopes to get Cory back from Cheryl, is Natalie's warm and loving behavior toward Wesley when they decide to break off their engagement. Even though Natalie knows that Wesley is developing feelings for Lindsey, she exhibits no hostility towards Lindsey. Natalie genuinely wants Wesley to be happy, even if that means it won't be with her.

### c.   *Other Key Characters Have No Counterparts*

The other key characters in the two works – who play major roles in important parts of the respective stories – have no counterparts. Thus, Lindsey's primary concern in the Film is her ability to care for her young daughter, Ariel, but there is no corresponding character to Ariel in the Book. Similarly, in the Film, Wesley's mother and brother – Wilimena and Walter Deeds – are key players in his life and in the telling of the story, but these characters have no counterparts in the Book. Finally, the only character of consequence in the Book other than Cheryl, Cory and Salina is Cory's twin sister Alicia, who is very concerned when Cory appears to be missing and plays the key role in uncovering Salina's scheme, but there is no corresponding character in the Film. Indeed, while Alicia and Walter are the siblings of Cory and Wesley, respectively, they actually exhibit completely opposite character traits.

As demonstrated above, the Film's characters bear no material similarity to the characters in the Book, let alone any legally cognizable similarity in copyrightable expression. Copyright law provides only limited protection to characters. Just as basic ideas elude copyright protection, basic character types are not protectable. See Warner, 720 F.2d at 242 ("Stirring one's memory

of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement."); Sheldon Abend Revocable Trust v. Spielberg, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) ("The bar for substantial similarity in a character is set quite high"); Hogan, 48 F. Supp. 2d at 310; Arden, 908 F. Supp. at 1261; Smith v. Weinstein, 578 F. Supp. 1297, 1303 (S.D.N.Y.), aff'd w/o op., 738 F.2d 419 (2d Cir. 1984) ("[N]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines").

Defendants respectfully submit that no reasonable person could find that the Film's characters meet anything even approaching this high standard for infringement.

### 3.    The Plots, Sequence, Pace and "Total Concept and Theme" of The Book and Film Are Different

Given that the Book and Film concern dissimilar characters in different settings, it comes as no surprise that the plots, sequence, pace and total concept of the two works are completely different.

The focus of the Book's plot is Cheryl's supposedly therapeutic unburdening of her tortured past, at the end of which she hopes to find out whether Cory loves her enough to marry her notwithstanding her traumas and the effect that they've had on her. The secondary plot concerns Salina's selfish and manipulative efforts to derail Cory's and Cheryl's relationship. Because the plots and events are different, there is, of course, also no similarity in the sequence of events. The pace of the Book is rather slow, because Cheryl's narrative of her life story – which occupies the bulk of the Book – is painfully detailed and tends to meander. (Indeed, Cory reflects this himself in his repeated comments and questions regarding when Cheryl will be done with her story and whether he really needs to know something she is telling him.)

The Film is different in every respect that is material to a claim of copyright infringement. The Film's plot is utterly dissimilar. It is not about the disclosure of anyone's traumatic past life, or testing the strength of a prospective fiance's love. Rather, the Film tells the story of a man who seems to live a charmed life but is unhappy because he is living to meet others' expectations rather than for himself, and about how a previously unknown woman becomes the outlet for that man to express his goodness, to escape his programmed existence, and to find some spontaneity and fun. Thus, among other things, while the Book is fundamentally a story about Cheryl's <u>past</u>, the Film is a story about Wesley's <u>present</u> life. Moreover, the Film's pace is much faster than that of the Book, because there is no slow, meandering telling of a past life, and the setting and character interplay are constantly changing. At the most abstract level, the Film is about a downtrodden woman helping an uptight businessman loosen up and enjoy life, which leads to romance. It is therefore in the genre of and more akin to the general theme of "Pretty Woman," but it is nothing like the Book. The two subject works thus bear no cognizable similarity.

"The total concept and feel of a literary work is comprised of the way an author 'selected, coordinated and arranged the elements of his or her work,' taking into consideration similarities in 'mood, detail or characterization.'" <u>Brown</u>, 2005 U.S. Dist. LEXIS 15995, at *31-32 (citations omitted). The "total concept and feel" of the Book and the Film are dissimilar, as are their mood, details and characterizations.

### C.   <u>Plaintiff's Copyright Infringement Claim Fails As A Matter of Law</u>

As discussed above, the Complaint makes only a general allegation that Defendants "adapted" the Book into the Film, but it offers no specific allegations regarding any alleged similarities, leaving one to guess about Plaintiff's grievance. The Film and the Book are so *dissimilar* that it is hard to imagine what similarities Plaintiff could claim to perceive. Even if

one strains to find *some* abstract similarity between the parties' works, it is difficult to come up with anything beyond the extremely general concept of a romantic story concerning an African-American man and woman, in which a second woman presents some sort of obstacle.[4] However, "[i]t is beyond dispute that copyright protection extends only to the expression of ideas, and not to the ideas themselves." Hogan, 48 F. Supp. 2d at 308 (citations omitted). See Muller v. Twentieth Century Fox Film Corp., 794 F. Supp. 2d 429, 440-41 (S.D.N.Y. 2011), aff'd by, Muller v. Anderson, 501 Fed. Appx. 81 (2d Cir. 2012); Lewinson v. Henry Holt & Co., 659 F. Supp. 2d 547, 565-67 (S.D.N.Y. 2009). Thus, this very broad and general idea is not original or proprietary to Plaintiff and is unprotectable as a matter of law.

As demonstrated above, the copyrightable expression of this abstract idea in the Film is nothing like that of the Book. In the Book, the African-American couple is already in love at the story's beginning, and the couple's engagement has to await the telling of the woman's traumatic life story and must survive the evil manipulations and scheming of the man's ex-girlfriend. In the Film, the man is already engaged to a good, caring woman at the story's open, but he befriends and then gradually falls in love with a previously unknown, down-on-her-luck widowed single mother who proves to be his escape from his overly-programmed life.[5]

---

[4] As discussed above, in the Film, Natalie does not really act as an obstacle; to the contrary, she sweetly lets Wesley go, realizing that they are not right for each other even though they share a deep mutual affection. In the Book, Salina is unbalanced and dangerous – she is so intent on getting Cory back that she risks killing both him and Cheryl.

[5] Plaintiff's own description of the Book's plot, as set forth in the pre-registration which she filed with the Copyright Office (Ex. A to Answer), supports – indeed, compels – the conclusion that the Film's plot is nothing like the Book's. Donald described her story as follows: "This book is a semi-biographical fictitious story that take takes excerpts for actual encounters from the Authors life in tragic form. It's a bout a woman who falls in Love with a multi, they get stranded in the ocean during a severe Hurricane, the intention of the trip was so that each person could air their dirty secrets of the past and only the woman is being honest with her past, her misspent youth to accidentally murdering her abusive husband, her secret gets spoiled before she had the chance to

Courts have routinely dismissed copyright infringement claims as a matter of law where the subject works contained far more numerous, and more material, similarities (and which did not require an exercise in speculation regarding the particulars of plaintiff's grievance). In Hogan, both of the subject works involved half-human, half-vampire main characters who sought "to uncover the truth about their origins...," and who were "faced with the choice of pursuing good or evil..." 48 F. Supp. 2d at 310. Both characters had a "sinister genealogy" and were "indoctrinated into the forces of evil by killing...," and both developed romantic interests. Id. In addition, "both works use[d] similar imagery, such as religious symbolism, biblical allusions and the use of doors to see into the past," and both works had "a 'macabre' feel, including scary characters and dark, haunted scenes." Id. The court nevertheless found that most of the alleged similarities were "unprotectable ideas and themes" that were "not uncommon to horror or science fiction literature." Id. at 310-11; see also Arden, 908 F. Supp. at 1260 (similarities in structure stemming from idea of repeating day are unprotectable).

Equally instructive is Berkic v. Crichton, 761 F.2d 1289, 1293-94 (9th Cir. 1985), where the court affirmed summary judgment for the defendants regarding their book and film, Coma, and explained:

> At a very high level of generality, the works do show a certain gruesome similarity. Both deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants. To some extent, both works take their general story from the adventures of a young professional who courageously investigates, and finally

reveal the truth to Cory, by Cory's meddling ex-girlfriend who happens to be an attorney who not only reveals Cheryl truth but Cory's hidden past. In the end Cheryl is faced with having to be the one to decide the fate of the relationship based on Cory's dishonesty of being physically abusive toward his ex-girlfriend. Cory's entire intention was to reveal his past and get engaged to Cheryl. It eventually pans out because Cory's Ex girlfriend leaves out the fact that she taunts Cory using psychology in order get him to behave ill mannered. The two Cory and Cheryl leave their past behind to enjoy their future."

exposes, the criminal organization. But this degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are "substantially similar." No one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.... [I]n Hollywood, as in the life of men generally, there is only rarely anything new under the sun.

As in Hogan, Arden and Berkic, the basic idea of a love triangle is not protectable, let alone in a case such as this, in which the idea is given such fundamentally opposite expression. See CBS Broad., Inc. v. ABC, 02 Civ. 8813 (LAP), 2003 U.S. Dist. LEXIS 20258, at *7, 19 (S.D.N.Y. Jan. 13, 2003) ("both shows combine well-known and frequently used generic elements of earlier works"; "the Second Circuit has held that copyright does not protect facts, generalized themes and ideas, subthemes, stock themes, general imagery, literary formulas ... episode or scenes a faire ....") (citations omitted); Green v. Lindsey, 885 F. Supp. 469, 483 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993) (summary judgment granted; broad themes of "warrior woman" are not copyrightable and "an inspection of the[] alleged similarities reveals that defendant's expression of these stock elements differs markedly from plaintiff's and, to the extent that similarities do exist, they are stock science-fiction elements ....") (citations omitted). See also Rucker v. Harlequin Enters. Ltd., No. H-12-1135, 2013 U.S. Dist. LEXIS 26299, at *1, 19 (S.D. Tex. Feb. 26, 2013) (dismissing copyright infringement claim alleging that defendant's romance novel infringed plaintiff's, both of which featured "a green-eyed, red-haired beauty and a tall, dark, handsome, wealthy man" because, inter alia, "[t]he couples in the two works have a different dynamic and relationship").

In comparison to these cases, all of which were dismissed despite having stories which, unlike the Book and Film, presented obvious – although nonactionable – similarities, Plaintiff Donald's claim is utterly frivolous. It is therefore respectfully submitted that, because "shared similarities must be more than just generalized ideas or themes," this Court should dismiss the

Plaintiff's claim herein, just as it recently did in Hallford, 2013 U.S. Dist. LEXIS 19625, at *17 (citations omitted).

## II.    PLAINTIFF'S REMAINING CLAIMS SHOULD BE DISMISSED

Plaintiff's second and third purported claims – for "Accounting and Constructive Trust" and "Injunctive Relief," respectively – must also be dismissed.  As discussed above, these claims merely repeat the allegations of the copyright infringement claim and ask for the stated remedies "as a result of defendants' infringement" without adding any substantive allegations.  (See Complaint at ¶¶ 25-28.)  As they merely seek certain remedies, these paragraphs properly belong in the Complaint's plea for relief, and are not independent legal claims.[6]

Plaintiff's claim for a constructive trust and accounting is also preempted.  Section 301(a) of the Copyright Act preempts state law claims that are based upon subject matter and rights equivalent to those addressed in the Act.  17 U.S.C. § 301(a).  See, e.g., Gary Friedrich Enters. v. Marvel Enters., Inc., 713 F. Supp. 2d 215, 222, 233 (S.D.N.Y. 2010); Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 249 n.9 (S.D.N.Y. 2000); Arden, 908 F. Supp. at 1264; Hobbs v. John, No. 12 C 3117, 2012 U.S. Dist. LEXIS 154452 (N.D. Ill. Oct. 29, 2012).

---

[6] Section 502 of the Copyright Act provides for injunctive relief as a remedy for infringement. Section 504(b) of the Act provides for the profits obtained by an infringer by reason of the infringement and thus serves as the equivalent.  17 U.S.C. §§502, 504(b).

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that Defendants' motion for judgment on the pleadings should be granted and Plaintiff's Complaint should be dismissed in its entirety, with prejudice.

Dated: July 2, 2013

PRYOR CASHMAN LLP

By: _____
      Tom J. Ferber
      Stephanie R. Kline
7 Times Square
New York, New York  10036
(212) 421-4100

Attorneys for Defendants